Filed 5/5/14  P. v. Tellez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B246281 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA055310) |
| v. | |
| SAMUEL A. TELLEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry Hall, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Yun Lee and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Samuel Tellez appeals from his convictions for second degree murder (Pen. Code,[1] § 187) and assault on a child causing death (§ 273ab), alleging insufficiency of the evidence, evidentiary error, prosecutorial misconduct, and unconstitutional restitution fines. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

One-month old Amelia Rose Hightower sustained injuries from being shaken and hit against a hard surface. Her symptoms became evident immediately after being in the care of Tellez. Tellez was charged with murder and assault on a child, causing death.

I.      Prosecution Evidence

At trial, Amelia's mother Krystal Hightower testified to the events that led up to Amelia's birth and death. Tellez had first contacted Krystal Hightower in late 2009 on a social networking website. They met that day and commenced a sexual relationship. Tellez gave Hightower a false name, did not reveal his address, and did not give her his telephone number. He repeatedly asked her for money, which she gave to him. In March 2010 Hightower discovered she was pregnant. She had no method for contacting Tellez directly, so she revealed her pregnancy to him on the social networking website they used. He immediately blocked her on the website and declined repeated requests to speak with her.

Eventually Tellez contacted Hightower again to ask for money, which she gave to him. He directed Hightower to have an abortion, but she refused. Tellez said he would "be there" for the baby. Tellez continued to contact Hightower for money but failed to provide Hightower with any way to contact him. Hightower became frustrated with the requests and refused to give him more money, stating that she was saving for her child. Tellez became angry and questioned whether he was the father of the child. Hightower resolved to raise the baby alone and deleted her profile from the social networking site they used.

---

[1]      Unless otherwise indicated, all further statutory references are to the Penal Code.

2

Hightower and Tellez resumed contact when Hightower was six or seven months pregnant because Hightower wanted her daughter to have a father in her life. She offered to put their past conflict aside and told him that she would like for him to be a part of his daughter's life. Tellez gave her no answer but asked for more money. Hightower began giving him money on a weekly basis. Tellez gave Hightower no telephone number and no address, and he only telephoned her from a blocked number.

In September 2010, Hightower and Tellez had met and been sexually intimate when Hightower discovered that she was bleeding. Tellez told her to go to the hospital and then left. Hightower was hospitalized for one to two weeks and was then on bed rest for the remainder of the pregnancy. Tellez contacted her but did not visit during that time.

Amelia Rose Hightower was born prematurely October 16, 2010. Tellez was not there and did not visit. Hightower asked him if she could give the baby his last name, to which he responded, "No, of course that's not okay. Why would you even ask that[?]"

Other than jaundice shortly after birth, Amelia was a healthy child. Hightower and Amelia were discharged from the hospital on October 18. Tellez asked her to meet him and told her to bring the baby. They met in the parking lot of a liquor store. Tellez looked at Amelia, laughed, and said, "You're so ugly."

Tellez constantly raised the subject of child support, telling Hightower that she was going to "screw [him] over"; Hightower constantly reassured him that she did not want financial support from him. "All I wanted," she said, "was [for] him to have a role in her life as her father and for her to know her father so that they had a relationship."

Tellez and Hightower began a pattern of visiting together. On Monday nights, she would take the baby to see him at the liquor store parking lot, and on Wednesdays and Fridays, he would come over to her house. Tellez only visited when Hightower's parents were not home, and he refused to meet her mother. At the visits at Hightower's house, Tellez always wanted to feed the baby, and Hightower would sometimes go downstairs to wash the bottles while Tellez cared for her.

3

Tellez was very moody.  Hightower never left the house when Tellez was there with the baby.  At one point Tellez asked to take the baby out alone, and Hightower refused.  Tellez then said he would not come to visit again and would not have anything to do with the baby.  He told Hightower she was a "huge disappointment" and that Amelia was a bastard.

Tellez scaled back his visits in the second week of November 2010.  Hightower and Tellez had argued, and he had said that Amelia was "a little fuck bitch," that she was "a nigger," and that he hoped that Hightower's "fat ass rolls over[,] crushing her instantly."  After he said such things, Tellez acted as though nothing had happened, and if Hightower attempted to discuss what had occurred, he accused her of focusing on the past and told her to "let it go."

On November 17, 2010, Hightower put Amelia down in her crib at about 7:00 p.m.  Amelia's color was normal at that time, she was breathing normally, and she was sleeping.  As Hightower put it, "She was the most perfect baby I have ever seen."  Tellez came over around 8:00 p.m.  Tellez asked if he could feed Amelia and picked her up from her crib.  She cried, which was her standard response to Tellez holding her.  Tellez often commented on Amelia's crying when he picked her up, calling her a brat, stating that Amelia hated him, asking why she cried, or telling her to be quiet.

Tellez instructed Hightower to warm up a bottle for Amelia, and Hightower went downstairs to do so.  She left Tellez holding Amelia in the bedroom near the crib.  While she was downstairs warming the bottle in the microwave, she could hear Amelia continue to cry.  Hightower was out of the room for one to two minutes.  When she returned with the bottle, Tellez was cradling Amelia in his arms in the same area of the room.  Nothing seemed out of the ordinary to Hightower at the time, although Amelia was partially hidden from view by Tellez's arm.

Hightower sat down to watch television with her back facing Tellez and the crib.  Soon thereafter, Tellez told her that Amelia was not taking the bottle.  This did not concern Hightower, because Amelia's previous feeding had taken place two and one-half hours earlier, and Amelia tended to eat every two and one-half to three hours.  Tellez

4

placed Amelia back in the crib and left the bedroom, saying that he was going to use the restroom.

After Tellez left the room, Hightower walked to the crib to look at Amelia. Amelia's face was bright red and her lips were blue. She was completely limp and gasping for air. Hightower screamed for Tellez and told him that Amelia was not breathing. Hightower called 911 and Tellez tried to administer CPR. Paramedics took Amelia to the hospital.

Amelia was airlifted from the Antelope Valley to Children's Hospital in Los Angeles. Tellez initially refused to discuss whether he would go to Children's Hospital, and then said, "I can't deal with this right now," and refused to go. Tellez gave Hightower no contact information and did not advise her on how to update him on Amelia's condition.

Hightower initially did not understand the severity of Amelia's condition. She brought Amelia's diaper bag to the hospital and expected that she would bring Amelia home from Children's Hospital. The doctors at Children's Hospital, however, told Hightower about Amelia's injuries. They discussed withdrawing life support. Law enforcement contacted Hightower and requested permission to search her home; Hightower gave full permission to access the house.

Tellez contacted Hightower and after she advised him about the issue of whether to withdraw life support from Amelia, he came to the hospital. Hightower knew that he caused Amelia's injuries, and she confronted him. Tellez denied knowing what had happened to Amelia. Tellez left the hospital.

Amelia was taken off life support and died on November 19, 2010.

Central to the prosecution's case was the testimony of Alan Toledo, a longtime friend of Tellez. Toledo testified that Tellez called him in the early hours of November 18. Tellez sounded distressed and asked if he could come over to Toledo's home. Tellez looked scared and worried when he arrived. He explained that he had come from the hospital and that something had happened to the baby. Toledo was unaware of Amelia's existence and thought Tellez was referring to his daughter S. Tellez repeatedly said that

5

he was going to jail. Toledo asked why, and Tellez said several times that he "hurt the baby." Tellez explained to Toledo that "he had another baby and he went over that night to go see the baby, and he was with the mother in the bedroom, and he asked the mother to go fix the bottle so he could feed the baby. And when she left the room, he shook the baby; the baby's head hit the edge of the crib. Then when the mom returned with the bottle, he tried to feed the baby but the baby wouldn't eat, so he put the baby back down, and he went to the bathroom. Then he heard the mom saying that there's something wrong with the baby." Tellez said that the baby's face was blue. Toledo asked why he had shaken the baby; Tellez responded that he had no reason and that he had no intention of doing it but knew that he had shaken her. Toledo was in shock and disgusted; he did not want to believe what Tellez was telling him. He wanted Tellez to leave.

Tellez urged Toledo to keep what he had said a secret and invoked the memory of their deceased friend Marcus. Toledo asked what he was going to do now, and Tellez said that he was going to go to his brother's home. Because Tellez had talked about committing suicide during their conversation, Toledo was concerned about him. Accordingly, Toledo offered to follow him to ensure he arrived safely, and he followed Tellez to the motel where the brother was staying.

Toledo could not sleep that night: "I was just hoping it was a bad dream and when I go to sleep, I'd wake up and everything would be back to normal and that didn't happen and I just didn't hear everything he just told me. When he told me, it felt like he had taken his burden off of his shoulders and threw it onto my shoulders, and I was carrying that weight of all the information he just told me." Toledo "knew [he] would have to do something about it eventually down the line," and feared being the bad guy.

Toledo later accompanied Tellez to Children's Hospital. Toledo wanted to talk to the social worker at the hospital "to make more sense of it," and he hoped that if he heard more from the social worker that he would learn that Tellez had been mistaken. Instead, the social worker explained that there were "obvious signs of child abuse" and that the only question was which parent did it, or whether they committed abuse together. Toledo testified that after hearing those words, he looked over at Tellez and Hightower: "I

6

looked over at Sam and I saw Sam. He had no emotion on his face. He was just cold. And I looked over at the mother, and it looked like she had been crying for the past night and her eyes were puffy. She just looked like a mess." Toledo testified, "I knew in my heart right there that what Sam told me was the truth."

After they had returned to the Antelope Valley, Toledo told Tellez that he needed to do the right thing and tell the sheriffs what he had done. Tellez pretended he had no idea what Toledo was talking about. The jury was shown photographs of texts from November 19 between Tellez and Toledo. Toledo had written, "I don't want anything to do with you. Do the right thing." Tellez responded, "Damn. All right. Peace out, dog. I love you, man. See you in another life maybe . . . ." Toledo understood that response to be a statement that he was going to commit suicide.

Toledo texted Tellez, "You have to go do the right thing. I can't live with this. So go do the right thing, stop being so selfish and man up." At trial, Toledo explained that he accused Tellez of selfishness because Tellez was "basically letting it go, like he didn't do anything, letting it ride on other people. And the way that I saw it, what the social worker told me, if they don't think it's Sam and Sam's not taking responsibility for what they did, they're going to put it on the mother. So in my eyes that was very selfish of him to be all right with putting the mom in that position when he's the one that did it."

Tellez answered, "Just leave me alone." Toledo responded, "I'm going to tell your mom. I can't believe you have no emotions toward this, what you did." Tellez texted Toledo, "I[ don't know] what you're talking about. All I know is you and Marcus," a reference to Tellez's invocation of the deceased friend Marcus when Tellez had asked Toledo to swear he would not tell what Tellez had told him. Toledo knew, based on these texts, that Tellez "wasn't going to man-up for his decision and [that he, Toledo,] was going to have to." Toledo felt uncomfortable, uneasy, and angry, because, he explained, "I knew I would have to go to it, and knowing that's the right thing, even though it's hard, I wanted to do that." Toledo told law enforcement what Tellez had told him.

On cross-examination, Toledo denied having a falling out with Tellez in 2010, then clarified that after the text message exchange they had fallen out. He admitted that he was trying in 2010 to get into the Los Angeles Police Department, but denied that he contacted law enforcement because he thought it might help him get into the police or sheriff's department. Toledo acknowledged that the first time he spoke with detectives he did not say that Tellez said he had hit the baby's head on the crib, and that he contacted them much later to give them that information.

The deputy medical examiner who performed the autopsy on Amelia, David Whiteman, M.D., also testified at trial. He determined that her death was a homicide caused by head trauma and its consequences, specifically the formation of a subdural hemorrhage, a skull fracture, and brain swelling. Amelia's skull fracture was a complex fracture because it was essentially two fractures originating from a single point on her skull; the fracture crossed her skull sutures. For a fracture to cross suture lines requires far more force than a fracture that stops at a suture line. The swelling of her brain pushed the skull sutures apart. On the left side of Amelia's head, there was a hemorrhage overlying the bone on both the galea and the periosteum, resulting from external force applied to the head that broke blood vessels. The hematoma from the subgaleal hemorrhage alone was approximately four inches long. She had a subdural hemorrhage on both sides of her brain and a subarachnoid hemorrhage as well. In excess of 30 milliliters of blood were poured from Amelia's skull at autopsy.

Amelia's eyes displayed optic nerve sheath hemorrhages and retinal hemorrhages, which are related to head trauma and may indicate a higher degree of trauma inflicted on a child. Optic nerve sheath hemorrhages are complications of more severe head trauma from rotational injury or shaking.

All of the injuries to Amelia's head were consistent with a single traumatic event, and one hard strike would be enough to have caused these injuries. Her injuries were consistent with being shaken by an adult man and having her head strike a hard surface like a crib. The medical examiner concluded that Amelia's brain was subjected to energy both from an impact causing the fracture and from shaking, and this caused part of her

8

brain to die. In addition, blood coated the brain and pushed against the brain, and the brain began to swell. The brain was pushed against the blood vessels, impairing the circulation of blood within the brain and its flow from the brain; this impairment caused more brain swelling, causing more of the brain to die, and that death in turn caused more brain swelling. This created a cycle in which the brain became liquefied and soft.

When a baby is injured in this manner, his or her breathing is compromised because the brain is shutting down and because the part of the brain that controls breathing is compressed as well. Physically, the baby might initially appear to be sleeping, but would actually be unresponsive and possibly turn blue from lack of breathing. The baby's health would be compromised within minutes of the injuries. Symptoms like blue lips, red face, limpness, and cessation of breathing could set in the time it would take for a bottle to be warmed and brought to the bedroom, to have an unsuccessful feeding attempt, to place the baby in the crib, and to use a restroom.

Pediatrician Carol Berkowitz, M.D., an expert witness on the subject of child abuse and child abuse head trauma who had reviewed Amelia's medical records, testified that she agreed with Whitehead's opinion as to Amelia's cause of death and injuries. Amelia was injured by an impact to the skull. Striking a hard surface like a crib could cause a skull fracture, galeal and subdural hemorrhaging, optic nerve sheath and retinal hemorrhaging, and intracranial hemorrhaging. Amelia's injuries were "very severe." Trauma like that inflicted upon her would result in the baby "immediately seem[ing] stunned, may stop breathing, may experience a color change, may gasp for air or seem like they're choking, may even pass out immediately." The onset of Amelia's symptoms was consistent with the events as described by Hightower and a severe head trauma while Hightower was out of the room.

II.     Defense Evidence

Tellez presented several witnesses in his defense and testified on his own behalf. His older brother, Rudy, testified that Toledo was a bad influence and described Toledo as merrily talking and joking on the way to Children's Hospital on November 19, 2010.

9

He testified that he believed that Toledo was lying and framing Tellez. Rudy Tellez never told the police about Toledo's character, his activities, or his inappropriate behavior in the car on the way to the hospital because Toledo was a prosecution witness and it was the police's job to find out this information.

Younger brother Art Tellez testified that Toledo had been cheerful and "real smirky" on the car ride to the hospital. Toledo was a "clown" who "never takes anything serious[ly]." He testified that Toledo was "real sneaky about things, grins about things," and was "not an honest person." In fact, Art Tellez testified that he had known for years that Toledo was a liar. He did not, however, tell the investigating officers that Toledo was a liar. Art Tellez also believed that the officers investigating the matter were biased against Tellez and that they were trying to "railroad" him into a murder conviction, but he never contacted the authorities to complain about the officers.

The defense also called investigating officer Luis Nunez to testify. The defense inquired into Tellez's level of cooperation and evasiveness and inquired into the process of excluding Hightower as a suspect. Social worker Shawn Rivas also testified when called as a witness by Tellez. He testified that he had spoken with Hightower on November 18 about Amelia's injuries and that Hightower had denied that she or Tellez would harm Amelia. Hightower appeared calm.

Tellez then testified. He admitted meeting Hightower through a social networking website for the purposes of finding a sexual partner. He admitted giving Hightower a false name and no contact information. He asked Hightower for money; sometimes he bought diapers for his older daughter, and sometimes he spent the money on oxycontin or heroin. Tellez acknowledged having arguments with Hightower during her pregnancy, but denied that he called the baby any derogatory names.

According to Tellez, Toledo knew about the baby while Hightower was pregnant and encouraged Tellez to keep asking for money from Hightower so they could spend it on drugs.

Tellez testified that he visited Amelia twice per week after she was born, and that he talked to her, held her, and fed her when he visited. On November 17, when he

10

arrived at Hightower's home, Amelia was sleeping and nothing was noticeably wrong with her. He asked when Amelia had last been fed, and Hightower said that she had been fed a few hours earlier. Tellez decided to feed her and picked her up; Amelia cried and turned red in the face. He told Hightower to warm up the bottle for about 10 seconds. Hightower was out of the room for 45 seconds to one minute, during which time he held Amelia in his arms and told her that her food was coming soon. Tellez denied shaking Amelia, hitting her head against the crib, or having any kind of accident with her.

Hightower returned with the bottle, then sat down in the room. Tellez tried to feed Amelia, but she did not suck on the bottle when it was in her mouth. Tellez returned Amelia to her crib; she looked a little red, but Tellez attributed that to Amelia having been crying. Tellez noticed nothing about her lips. Tellez used the bathroom for a minute or so, and was nearly finished when he heard Hightower screaming. Tellez saw that Amelia's lips were blue. They called 911 and Tellez attempted to administer cardiopulmonary resuscitation at the instruction of the 911 operator. Amelia was gasping for breath.

Tellez testified that he went to the hospital to make sure that Amelia was all right. He was distraught and told Toledo that night that "Something's going on with my baby. It's not good." At that time Tellez was not close to Toledo, and he had only contacted Toledo to try to find his brother Art. He testified that he did not tell Toledo that he had shaken or hurt Amelia.

Tellez went to Children's Hospital with his brothers and Toledo. He knew that something was wrong because the deputy sheriff wanted to speak with him. He did not want to believe that Amelia had been abused, and he did not understand it. He left the hospital after a few hours because he was only able to see Amelia for a few minutes, and visits were monitored; he was also uncomfortable because he knew that Hightower and her mother were blaming him for what had happened to Amelia. He knew at the time he left that removing Amelia from life support was being discussed, but he did not know until the following day that a decision had been made to do so. At that time he "broke

11

down completely," "completely changed," and was never the same again. He began drinking alcohol, returned to drug use, and lived in his car until he was hospitalized.

Tellez testified about Toledo. They had known each other since he was 13 years old. They had falling-outs over the years because Tellez owed Toledo money multiple times. Toledo and Tellez often argued, and Toledo threatened to beat him up more than once. Tellez had begun to distance himself from Toledo in 2010 because Toledo was threatening and bullying him. Tellez had stopped talking to Toledo but later resumed contact because Toledo was his "go-to guy to score drugs." Tellez did not remember receiving a text message from Toledo urging him to do the right thing, and he said that the message he sent in response made no sense to him, although he agreed that he probably sent the message. He denied ever telling Toledo that he had hurt Amelia and making him swear not to tell, and he did not understand what his text message to Toledo making reference to swearing on the memory of a dead person meant.

Tellez also presented the testimony of Hideo Itabashi, M.D., the neuropathologist who had examined Amelia's brain at the request of the medical examiner. Itabashi's examination of Amelia's brain was difficult because Amelia's brain had liquefied. He was unable to make a full evaluation of the brain or an anatomic evaluation of the various parts of the brain due to the liquefaction. Under a microscope, Itabashi did see signs of a subdural hemorrhage that was starting to organize. The hemorrhage occurred about two to three days before Amelia was declared brain dead, and it was most likely caused by trauma. Itabashi did not know precisely when Amelia's brain died. Itabashi also found hemorrhaging and macrophages in Amelia's leptomeninx, a clear membrane around the brain's surface, and in the brainstem. Macrophages are scavenger cells that enter injured tissue, and they appear two to three days after an injury, although some research suggests they may appear within 12 to 24 hours. The macrophages contained hemosiderin, a substance that results from the breakdown of red blood cells; its presence indicates that enough time has passed since an injury for the red blood cells to break down and the macrophages to consume the breakdown products of the blood. Macrophages containing hemosiderin occur three to four days after injury. Unless Amelia had other injuries to

12

prompt macrophages, the injury had occurred three to four days before her brain death. More than likely the bleeding in the different parts of Amelia's brain began at the same time, although the subdural hemorrhage did not contain macrophages.

The defense also called forensic pathologist David Posey, M.D., to testify as an expert witness. Posey testified that in his opinion from reviewing the records of the case, Amelia's manner of death was undetermined. He testified that it was unknown how Amelia's skull fracture occurred and observed that there was "no good external evidence of injury," because there was no bump on the head where the fracture occurred and only some small hemorrhages underneath the scalp and on the scalp surface. Other than that, he found no evidence of a recent injury to the head other than the skull fracture, and when that fracture was sustained could not be determined. He would have expected to see external injuries if Amelia's head had been hit against a crib.

Posey excluded natural causes as a reason for Amelia's death. The skull fracture was caused by "a significant amount of force." The injury could have been caused by point impact or by a large area of impact. Posey saw no evidence of shaken baby syndrome in this case because Amelia did not sustain a neck injury. Posey thought that Amelia's injury could be consistent with a simple fall to the ground. If Amelia instantaneously stopped breathing after being hit against an object, he would find that consistent with second-impact syndrome, meaning that there had been a prior injury from which the brain had recovered, but the brain could not respond to a second injury, causing immediate lethargy or cessation of breathing.

The jury convicted Tellez of second degree murder and assault on a child causing death. He appeals his convictions and sentence.

## DISCUSSION

### I.      Sufficiency of the Evidence of Murder

Tellez argues that the evidence was insufficient to support the jury's finding that he murdered Amelia. Specifically, Tellez challenges the evidence that he harmed Amelia: He argues that the medical testimony did not definitively establish that Amelia

13

was injured while he was with her in the bedroom; there were no eyewitnesses to the injuries; and Toledo was the only witness to testify that Tellez had confessed. Next, he asserts that there was no evidence of malice. Finally, he claims that no reasonable juror would have believed Toledo's testimony that Tellez confessed to shaking Amelia and hitting her head on the crib. Ultimately, Tellez urges this court to "find the evidence against appellant improbable, amounting to insufficient evidence to support the jury's finding."

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639 (*Jennings*).)

Viewing the record in the light most favorable to the verdict, the evidence was sufficient to support a determination that Tellez committed an act causing Amelia's death. Amelia was healthy and fine when Hightower put her down in her crib, and she was responsive when Tellez picked her up from her crib. He was left alone with her for a brief period while Hightower warmed a bottle. Only a few minutes later, Amelia had stopped breathing, turned blue, and was limp and unresponsive. As Whitehead and Berkowitz's testimony showed, these symptoms were entirely consistent with Tellez having shaken her and hit her against the crib in the moments he had her alone.

Moreover, Tellez confessed to Toledo that he had shaken Amelia and hit her against the crib.

The evidence was also sufficient to support a determination that Tellez acted with malice when he caused Amelia's death. Malice may be express or implied. (§ 188.) Malice is implied "when the killing is proximately caused by '"an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with a conscious disregard for life."' [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . ." (*People v. Knoller* (2007) 41 Cal.4th 139, 143.) Here, Tellez testified that his first daughter had been born one month prematurely, just like Amelia, and that he knew that premature infants are fragile and must be treated very gingerly. He knew that shaking a premature baby put the baby's life at risk. He knew that shaking a premature baby would kill the baby. A reasonable jury could conclude, based upon this evidence, that Tellez was aware that his actions in shaking Amelia and causing her head to strike the edge of the crib would endanger her life, and that he acted with a conscious disregard for her life.

Tellez contends, however, that he had not ever tried to hurt Amelia before, and that he had not harmed his older daughter. He contrasts the facts of this case with those in *People v. Cravens* (2012) 53 Cal.4th 500, a case in which the defendant knocked out a smaller, intoxicated victim with a very hard punch in a manner to ensure he would fall on concrete; had used deadly punches at other times; and laughed after he had knocked the victim to the ground. He claims that here "there was no evidence that what happened was anything other than an accident." None of these statements tends to demonstrate the insufficiency of the evidence of malice or murder. Tellez may not have harmed his daughter previously in the month she had been alive, and he may never have harmed his older child, but that does not tend to establish that he did not murder Amelia in November 2010. Certainly the facts of this case differ from those in *Cravens*, but *Cravens* does not purport to restrict the definition of implied malice to the facts of that case, and it has no application here. Moreover, there was evidence Amelia's injuries

15

were not accidental: the deputy medical examiner testified that her injuries were not caused by something like a simple fall but that her skull sustained a complex fracture from external force such as slamming her head into a hard surface. To cause fractures like those Amelia suffered, Whitehead testified, would require more force than generated by a fall from a two-story building.

Finally, Tellez argues that the judgment should be reversed it because was inherently improbable. "'Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements, given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. (Citing cases.) Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]'" (*People v. Lyons* (1956) 47 Cal.2d 311, 319-320.)

Tellez argues that Toledo's testimony was inherently improbable because "it did not reflect normal behavior by him." He asserts that if Tellez had actually confessed, Toledo would have called the police immediately instead of waiting. While calling the police upon hearing Tellez's confession would have been a logical course of action, there is nothing inherently improbable in Toledo's account of being stunned by his childhood friend's confession to killing an infant daughter that Toledo had never even heard of; in hoping that at the hospital he would learn information that exculpated Tellez; and in urging his friend to come forward before turning him in. Tellez has not demonstrated any physical impossibility or apparent falsity in Toledo's testimony with this argument.

Tellez next argues that it was not reasonable that Toledo failed to mention that Tellez specifically said he struck Amelia against the crib until a year after he first reported Tellez, and only after he had received a subpoena to testify. Tellez does not explain why it is not reasonable that Toledo could have forgotten to tell law enforcement

16

that Tellez said that Amelia's head hit the crib when he initially reported that Tellez shook the baby to death. It is not unusual for witnesses to forget certain details, and Tellez has not established anything unreasonable or inherently improbable here. Here again, Tellez has not demonstrated any physical impossibility or apparent falsity in Toledo's testimony.

Next, Tellez argues that Toledo had an incentive to give untruthful testimony: he felt Tellez owed him money and wanted it back. He had beaten Tellez up and damaged his property. Finally, he contends that Toledo's motive for incriminating Tellez was that he wanted law enforcement employment. Here again, Tellez has not established any physical impossibility in the testimony or any falsity apparent on its face; at best, he has shown that the testimony could be subject to justifiable suspicion. But evidentiary "'[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'" (*People v. Lyons*, *supra*, 47 Cal.2d at pp. 319-320.)

## II. Sufficiency of the Evidence of Assault on a Child Causing Death

Tellez challenges the sufficiency of the evidence to support the conviction for assault on a child causing death. The elements of the offense are (1) a person, having the care or custody of a child under the age of eight, (2) assaults the child, (3) by means of force that to a reasonable person would be likely to produce great bodily injury, (4) resulting in the child's death. (§ 273ab.)

The evidence was sufficient to support the conviction. Tellez had care and custody of Amelia at the time of the incident. Tellez admitted shaking Amelia and striking her against the crib. Amelia suffered serious head injuries, and medical testimony demonstrated that her injuries were likely caused by blunt force trauma to her head from being shaken and hit against a hard surface. A reasonable person would realize that great bodily injury would directly, naturally, and probably result from the act of shaking an infant and striking her head against a hard surface. Amelia died from her

17

injuries. Based on the evidence, a rational jury could find beyond a reasonable doubt that Amelia, who was one month old, died at the hands of Tellez, a caretaker who intentionally used force that a reasonable person would believe was likely to cause great bodily injury.

Tellez, however, argues that his conviction should be reversed because there was no evidence that he "was aware that what he was doing with Amelia would lead a reasonable person to realize that great bodily injury would result to her." This appears to be an argument that Tellez lacked subjective awareness that he was harming Amelia. Subjective awareness, however, is not required for a conviction of assault on a child, causing death. "[A]ssault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur." (*People v. Wyatt* (2010) 48 Cal.4th 776, 785.) Instead, "a defendant may be guilty of an assault within the meaning of section 273ab if he acts with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act." (*Id*. at p. 781.) Here, Tellez admitted to Toledo that he shook Amelia and caused her head to strike the crib, and a reasonable person would realize that great bodily injury would directly, naturally, and probably result from the act of shaking an infant and striking her head against a hard surface. Moreover, Tellez testified to his actual, subjective awareness that such conduct would endanger the life of a baby. Specifically, Tellez testified that he knew that premature infants are fragile and must be treated very gingerly; that shaking a premature baby put the baby's life at risk; and that shaking a premature baby will kill the baby. Therefore, even though a defendant "need not know or be subjectively aware that his act is capable of causing great injury," (*id*. at p. 781), here Tellez was aware that the act of shaking Amelia and striking her head against the crib could cause her death.

Tellez argues that "the testimony was not conclusive as to whether" Amelia's skull fracture "would have occurred while appellant was in the bedroom with her," and he points to defense medical expert testimony concerning lapses of time between a skull fracture and the onset of visible symptoms; the possibility that this injury was caused by a

18

fall; the absence of visible external injuries on Amelia; the rounded nature of the crib not providing an obvious location for a "point impact" type of injury; evidence of a prior injury; and the presence of macrophages in her brain and healing on her optic nerve. These arguments establish only that there were conflicts in the evidence, not that there is insufficient evidence to support the conviction. "We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Jennings*, *supra*, 50 Cal.4th 616 at pp. 638–639.)

Next, Tellez argues that this conviction should be reversed because no reasonable juror could have believed Toledo's testimony. We have already rejected this argument above and need not repeat the discussion here.

### III.    Alleged Evidentiary Errors

A. Nunez's Testimony

The defense called as a witness one of the officers who had investigated Amelia's death, Sergeant Luis Nunez. Defense counsel asked a series of questions about the investigation, beginning with whether Tellez was cooperative during interviews. Nunez answered that Tellez was cooperative and had come to the station twice for interviews when requested to do so. Defense counsel asked whether Hightower had been considered a suspect in Amelia's death. Nunez answered that she had been a suspect. Defense counsel asked whether she had been ruled out as a suspect, to which Nunez responded affirmatively, and asked how she had been ruled out as suspect. Nunez answered, "By the sum total of the information we received throughout the investigation." Defense counsel asked what had been the determining factor leaving Tellez as a suspect and not Hightower, to which Nunez responded that Tellez's statements as related by Toledo were

19

a major factor, as well as the fact that the accounts given by Toledo and Hightower were consistent.

On cross-examination, the prosecutor elicited testimony from Nunez that although Tellez had been cooperative to the extent that he came in voluntarily to speak with law enforcement, he was evasive and could not provide answers to their questions. Nunez testified that Tellez's evasiveness, as well as the other evidence, led him to believe that Tellez was responsible for Amelia's death. The prosecutor asked, "So the sum total of all the evidence that you uncovered during the investigation showed that the defendant, Sam Tellez, shook Amelia Hightower and when he was shaking her, caused her head to strike the crib and caused all those traumatic injuries that [the medical examiner] testified to?" Nunez responded, "Yes."

On redirect examination, defense counsel asked Nunez what, exactly, Tellez had been evasive about. The prosecutor objected on hearsay grounds, but the court overruled it because the door had been opened. Nunez was permitted to testify that Tellez "would not give a direct answer to the question and then would answer with something to the effect of that he couldn't remember details of his conversation with [Hightower], and at some point that, you know, what was he supposed to do, remember everything they spoke about, or he may have said, written it down or something, and then eventually would admit to possibly saying something like that, but he wasn't sure." Nunez testified that Tellez was evasive in response to a wide range of topics, including whether he had ever called the baby derogatory names or whether he had said Hightower should roll over on the baby. Defense counsel asked how Nunez knew he was being evasive rather than just forgetting details, and Nunez responded that Tellez made statements trying to distract the detectives and change subjects, and that Tellez claimed not to remember things that Nunez thought a person would remember and about which he or she could answer questions directly.

Tellez was also evasive about whether he had injured Amelia, Nunez testified. When asked how Tellez was evasive, Nunez responded, "It's a sum total of his answer, his posture, his demeanor. I wish we had videotaped the interview so you could get a

20

better picture of what I'm saying, but it's all of that together, his answers, his mannerism, his posture, the struggle he appeared to be going through in talking to us specifically about the child. And these are based on my experience, having interviewed hundreds if not thousands of people. I can look at the man, I can talk to the man, and I can see he's going through some heartache, some struggle, and that it wasn't coming out. And I could clearly see that he was holding back, and he never admitted to it."

Defense counsel asked if there were any other areas in which Nunez believed Tellez had been evasive beyond calling the baby names and his demeanor during the interview. Nunez responded, "And the question about whether he injured the baby or not," noting that at one point Tellez said that it was possible that Hightower injured Amelia, but then backed off when asked if he was accusing her of harming Amelia. Defense counsel asked if there was anything else, and Nunez answered, "All of those things are what le[]d me in my experience to believe he's being evasive, yes."

On re-cross examination, the prosecutor elicited testimony from Nunez that he also believed that Tellez was evasive with respect to information about Toledo. Then, the prosecutor asked, "So in the sum total of all the evidence you collected, you made the determination that the defendant had caused the murder of Amelia Hightower?" Nunez answered, "I believe so, yes."

Defense counsel moved to strike the final answer on the grounds that it went to the ultimate issue in the case. The court observed that ordinarily the entire line of questioning would be improper, but that the defense had chosen to inquire into Nunez's evaluation of the credibility of the various actors: "Normally, those questions are all inadmissible, and they're all improper questions. However, in this matter, the defense raised the issue and made a tactical decision to . . . isolate Alan Toledo's testimony as being the difference between Krystal Hightower's statements to the officer and Mr. Tellez's statements to the officer with an intent, I think, to synthesize it down, to leave the jury with a question that they either believe or don't believe Mr. Toledo, and that's the difference between Mr. Tellez being guilty or not." Having presented the issue as one of credibility of Tellez, Toledo, and Hightower, the final question logically followed:

21

"[T]he last question that was posed by the prosecution, again, would normally be a question that wouldn't even be close to a proper question, but under the circumstances of the direct examination in this case, it was a proper question. The detective did give a statement early in his testimony that there were a whole variety of things that led him to conclude that Mr. Tellez wasn't being truthful and Ms. Hightower was being truthful. That last question went to that issue that was brought up by the defense."

Tellez contends that Nunez's testimony constituted an impermissible opinion on the ultimate issue of guilt and that its admission constituted prejudicial error that violated his right to a fair trial. We review evidentiary rulings for an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) There was no abuse of discretion here. The defense had chosen to question Nunez on his determinations of the truthfulness of Tellez, Toledo, and Hightower; on how he identified a suspect in this case; on Tellez's cooperation and/or evasiveness; and on how Nunez concluded that he was evasive. The prosecutor's final question on re-cross examination, like his summarizing question on cross-examination, was designed to pull together the various elements of Nunez's testimony and emphasize for the jury that based on various factors and the investigation as a whole, Nunez had concluded that Tellez, not Hightower, should be the suspect in Amelia's death. Given that the defense had first introduced and then probed this area of inquiry, we find no abuse of discretion in the court's determination that the question was proper.

Tellez relies primarily on two cases to support his argument that the testimony was improper: *People v. Sergill* (1982) 138 Cal.App.3d 34 and *People v. Killebrew* (2002) 103 Cal.App.4th 644.[2] In *Sergill*, the testifying officer improperly offered an opinion on the veracity of a victim's statements. (*Sergill*, at pp. 38-40.) In *Killebrew*, an officer testifying as an expert witness improperly testified to his opinion as to the subjective

---

[2]    In *People v. Vang* (2011) 52 Cal.4th 1038, the California Supreme Court seriously questioned the reasoning of *Killebrew*. As the facts and issues of this case are fundamentally dissimilar to those in *Killebrew*, we need not consider its continued vitality here.

knowledge and intent of specific gang members. (*Killebrew*, at pp. 658-659.) The circumstances here are not similar. Nunez did not testify as to the veracity of Tellez's statements or to his subjective knowledge and intent; instead, he testified to how, when faced with two potential suspects, he determined that Tellez was the primary suspect and excluded Hightower from suspicion. In neither *Sergill* nor *Killebrew* had the officers been questioned by the defense about how they determined that one of two possible suspects should be the primary suspect—this line of inquiry, initiated by the defense, necessarily required Nunez to testify to the various factors that led him to credit Hightower's account of events and distrust Tellez's. Under these specific circumstances, Nunez's testimony that he concluded that Tellez caused Amelia's death was not an improper opinion on the ultimate issue.

    B. Toledo's Testimony Regarding Social Worker Statements

    During Toledo's testimony, he described going to Children's Hospital with Tellez and his brothers. According to Toledo, he wanted to talk to the social worker because he was trying to make sense of what had happened and because he hoped that there was some way that Tellez had not in fact been responsible for Amelia's injuries. Toledo began to relate what the social worker had said, and defense counsel objected that the statements were hearsay. The trial court admitted the social worker's statement for the limited purpose of "the effect that it had on this particular witness or how he reacted to that." The jury was cautioned that the statements were not admissible for the truth of the matter asserted, but only for the purpose of explaining why Toledo did what he did.

    Toledo went on to testify that the social worker said that there were obvious signs of child abuse and that either Tellez did it, Hightower did it, or they did it together. Toledo testified that after hearing what the social worker said, he looked over at Tellez and Hightower: "I looked over at Sam and I saw Sam. He had no emotion on his face. He was just cold. And I looked over at the mother, and it looked like she had been crying for the past night and her eyes were puffy. She just looked like a mess." Toledo testified, "I knew in my heart right there that what Sam told me was the truth."

23

On appeal, Tellez argues that the statements were irrelevant and inadmissible as hearsay, and that their admission infringed on his constitutional right to a fair trial. We disagree. The testimony was relevant and properly admissible for the nonhearsay purpose of showing its effect on Toledo. Toledo had wanted to talk to the social worker so that he could sort out for himself whether Tellez's confession to harming Amelia was true. When he heard what the social worker said, and observed Tellez and Hightower, he reached the conclusion that Tellez had been telling the truth when he said he injured Amelia. The evidence, therefore, was presented not as evidence that there had been child abuse, but for its effect on Toledo and his state of mind. As Toledo's credibility was a central issue at trial, Toledo's thought processes, his state of mind, and the events leading up to his decision to report Tellez to the police were highly relevant. Accordingly, the evidence was properly admitted as nonhearsay evidence for the limited purpose of the effect on the state of mind of the listener. (*People v. Marsh* (1962) 58 Cal.2d 732, 737-738.)

## IV.    Prosecutorial Misconduct

During closing argument, the prosecutor said, "Sergeant Nunez and Detective Tomlin gave the defendant and other family members, Art Tellez, Rudy Tellez, even his mother, the opportunity to provide evidence of the defendant's innocence. What is the credible evidence that we have that even the defendant's mother didn't tell Sergeant Nunez that his son—her son is innocent. That's the credible evidence." Tellez argues that this constituted prosecutorial misconduct.

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""the use of deceptive or

24

reprehensible methods to attempt to persuade either the court or the jury.”’”’ [Citation.]’ [Citation.]” (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*).)

To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely objection, make known the basis of the objection, and ask the trial court to admonish the jury. (*Hill*, *supra*, 17 Cal.4th at p. 820.) Unless the prosecutor’s misconduct could not be cured by an admonition, the defendant must object to the alleged misconduct at trial. Although Tellez conclusorily states that an admonition would have been “counterproductive” because it would have called attention to the remark, there is no evidence that an admonition would have been insufficient to remedy any misconduct. Tellez has therefore waived this argument by failing to object at trial. (*People v. Ochoa* (1998) 19 Cal.4th 353, 428.) We address the merits of the issue nonetheless, however, because Tellez argues that his trial counsel’s failure to object constituted ineffective assistance of counsel within the meaning of *Strickland v. Washington* (1984) 466 U.S. 668 because there could be no valid tactical reason for failing to object. (See *People v. Nation* (1980) 26 Cal.3d 169, 179.)

Tellez argues that the argument was improper because the prosecutor stated facts not in evidence and attempted to shift the burden of proof to Tellez. These facts were, however, in evidence. Nunez testified that neither of Tellez’s brothers called him to say that Tellez was innocent. He testified that Tellez’s mother did telephone him to express concerns about his welfare, but that she never said that her son was innocent. Nor did the statement, taken in context, shift the burden of proof to Tellez. The prosecutor’s comments came in the course of his argument that not only had the prosecution proven Tellez guilty beyond a reasonable doubt, but the credible evidence presented by the defense also showed that he was guilty. Specifically, the prosecutor observed that even though Tellez’s family members now maintained that he was innocent, they never told the police anything of the kind. Tellez, when speaking with the police, never told them about bullying or broken property. Then, when he came to court, he testified about Toledo’s supposed violence. The prosecutors said, “The defendant’s own words when he lies to you, that’s competent evidence of how the defendant is guilty, ladies and

25

gentlemen.  He comes in and lies because his words aren't consistent.  He lies."  While the prosecutor's words could have been better chosen, he did not shift the burden of proof to the defendant; he merely observed that the out-of-court statements by those aligned with the defense did not include any protestation of Tellez's innocence.  Contrary to Tellez's arguments, this case is not similar to *People v. Gaines* (1997) 54 Cal.App.4th 821, at pages 824 and 825 (misconduct when prosecutor represents to the jury what a non-testifying witness would have said and makes statements on subjects for which there was no evidence presented); *People v. Johnson* (1981) 121 Cal.App.3d 94, at page 102 (misconduct for prosecutor to state that the complaining witness would deny making an extortion demand when there was no evidence she would do so); or *Hill*, *supra*, 17 Cal.4th at pages 829 through 832 (misconduct for prosecutor to advise jury that there had to be some evidence on which to base doubt, to imply a witness who did not testify would have testified favorably to the prosecution, and to assert that a defense witness lied because her friend was a relative of the defendant, of which there was no evidence).

Because we find that the challenged statement was not prosecutorial misconduct, it was not ineffective assistance of counsel for defense counsel to fail to object to it.

## V.      Restitution Fine Challenge

Tellez challenges the $280 restitution fine imposed under section 1202.4.  Tellez acknowledges that his failure to object to the fine at trial would ordinarily constitute a forfeiture of the issue (*People v. Scott* (1994) 9 Cal.4th 331, 353-354 (*Scott*)), but he attempts to avoid forfeiture by contending that the $280 fine is actually an unauthorized sentence.  According to Tellez, when the court remarked at sentencing that Tellez was unable to pay the cost of attorney services, so those costs were waived, the court was also announcing that it wanted to impose the lowest possible restitution fine amount.  Tellez then argues that the imposition of the $280 fine indicated that the court did not recall that the lowest fine the court could impose was $200, the statutory minimum at the time that the crimes were committed.  Tellez argues, "Although this amount, $280, still was within the statutory range for restitution fines, because the trial court intended to give appellant

26

the lowest statutory amount, the amount ordered was not the statutory minimum at the time the crimes were committed, thereby violating the constitutional prohibition against ex post facto laws, [and] the $280 should be considered unauthorized."

There is no support in the record for Tellez's characterization of the events. The court did not state that it wanted to impose the lowest possible restitution fine; its comments concerned Tellez's inability to pay for the cost of attorney services. Nothing in the record indicates that the court intended to do anything other than impose a $280 restitution fine when it imposed a $280 restitution fine. As Tellez acknowledges, this fine falls within the statutory range authorized by law at the time of the offense. (*People v. Souza* (2012) 54 Cal.4th 90, 143 [for ex post facto analysis purposes, the amount of a restitution fine is determined as of the date of the offense].) There is, therefore, no ex post facto violation. Moreover, this was not an unauthorized sentence. An unauthorized sentence is one that could not lawfully be imposed under any circumstance in the particular case. (*Scott*, *supra*, 9 Cal.4th at p. 354.) Because the amount of the fine was within the statutory range for restitution fines applicable at the time of his crime, it could lawfully be imposed here. Tellez had the opportunity to object to the discretionary amount of the restitution fine at the time of sentencing, and having failed to do so, he has forfeited his claim. (*People v. Tillman* (2000) 22 Cal.4th 300, 302.)

**DISPOSITION**

The judgment is affirmed.

ZELON, J.

We concur:

WOODS, Acting P. J.                    SEGAL, J.[*]

_____

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27